IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

DAMARIS MALDONADO VIÑAS, et al.,

Plaintiffs,

v.

NATIONAL WESTERN LIFE INSURANCE
COMPANY,

Defendant.

CIVIL NO. 14-1192 (CVR)

## OPINION AND ORDER

## INTRODUCTION

In April and May 2011, Carlos Iglesias-Alvarez ("Mr. Iglesias") purchased two annuities from Defendant National Western Life Insurance Company ("NW"). The beneficiary of both annuities was his brother, Francisco Iglesias-Alvarez, a resident and citizen of Spain ("Francisco Iglesias, the Spanish national"). Mr. Iglesias purchased the annuities using $2,935,000.00 of conjugal partnership funds without his wife's consent. Later that same year, on November 2, 2011, Mr. Iglesias died and his brother, the beneficiary, collected approximately $3,000,000.00 dollars from both annuities unbeknownst to Mr. Iglesias' widow, Plaintiff Damaris Maldonado Viñas, or their sons José Carlos Iglesias Maldonado and Juan Carlos Iglesias Maldonado ("collectively, Plaintiffs"). Plaintiffs now sue to collect what they believe is rightfully theirs.

The parties agreed that summary disposition of the claims herein presented was viable, and were ordered to file simultaneous motions for summary judgment. Both parties so complied. (Docket Nos. 73 and 74). Their arguments boil down as follows.

Plaintiffs argue that:

1. Annuity no. 2 is void because it was never perfected. The first application lacked a signature and was issued by an agent with a suspended license and a terminated contract.   The second application lacked the signatures of the annuitant and the owner, and ratification is unavailable to Defendant.

2. Annuity no. 1 is null because it was obtained by an unlicensed agent.

3. Lack of spousal consent in the use of conjugal funds to purchase the annuities voids both annuities and they do not fall under any exception available under the Civil Code.

Defendant argues that:

1. Plaintiffs lack any factual basis to dispute the owner's consent evidenced by a signature in the application for Annuity no. 2, nor can they dispute the legal standard that allows for the ratification of such annuity.

2. The participation of an unlicensed agent does not entail the nullity of a policy, and therefore the licensing status of the different individuals who appeared as agent on Annuity no. 1 is irrelevant to their validity and effectiveness.

3. Spousal consent is unnecessary for the purchase and subsequent validity of the annuity policies.

4. Assuming any of Plaintiffs' causes of annulment were to succeed, Plaintiffs must restore the amounts received as insurance benefits under the annuities to

NW if they ask NW to return them the premiums paid by the deceased, Mr. Iglesias.

NW also posits, for the third time, that the recipient of the funds in question and beneficiary to the annuities, Francisco Iglesias, the Spanish national, is an indispensable party to this case as he is a direct party to the contract, and thus, relief without him is incomplete.

## STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56 (c). Pursuant to the language of the rule, the moving party bears the two-fold burden of showing that there is "no genuine issue as to any material facts," and that he is "entitled to judgment as a matter of law." Vega-Rodríguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).

After the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact." Cortés-Irizarry v. Corporación Insular, 111 F.3d 184, 187 (1st Cir. 1997). A fact is deemed "material" if it potentially could affect the outcome of the suit. Id. Moreover, there will only be a "genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." Id.

At all times during the consideration of a motion for summary judgment, the Court must examine the entire record "in the light most flattering to the non-movant and indulge all reasonable inferences in the party's favor."  Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

The First Circuit Court of Appeals has "emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]."  Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007); *see also*, Colón v. Infotech Aerospace Servs., Inc., 869 F.Supp.2d 220, 225-226 (D.P.R. 2012).   Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is -and what is not- genuinely controverted.' "  Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006)). Local Rule 56 imposes guidelines for both the movant and the party opposing summary judgment.   A party moving for summary judgment must submit factual assertions in "a separate, short, and concise statement of material facts, set forth in numbered paragraphs." Loc. Rule 56(b). A party opposing a motion for summary judgment must "admit, deny, or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of facts." Loc. Rule 56 (c).    If they so wish, they may submit a separate statement of facts which they believe are in controversy.   Facts which are properly supported "shall be deemed admitted unless properly controverted." Loc. Rule 56(e); P.R. Am. Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 130 (1st Cir. 2010) and Colón, 869 F.Supp.2d at 226.   Due to the importance of

this function to the summary judgment process, "litigants ignore [those rules] at their

peril."   Hernández, 486 F.3d at 7.


## FINDINGS OF FACT

The parties submitted a Joint Statement of Uncontested Facts (Docket No. 69)

which is applicable to both motions for summary judgment.   Based on that document,

the Court finds the uncontested facts in this case to be as follows:

### I. Family Background

1. Carlos Iglesias-Alvarez was born in Madrid, Spain, on August 11, 1948 and he

died in Bayamón, Puerto Rico on November 2, 2011.

2. At the time of his death, Carlos Iglesias-Alvarez was a citizen of Spain and of the

United States of America.

3. Francisco Iglesias-Alvarez, who is a citizen and resident of Spain, is Carlos

Iglesias-Alvarez' brother.

4. On February 11, 1989, plaintiff Damaris Maldonado Viñas married Carlos

Iglesias-Alvarez. Complaint, Docket No. 1, ¶ 5; Answer to Complaint, Docket No. 26, ¶ 5;

NW Docket No. 42-1, ¶1 and P's response at Docket No. 44-1.

5. Plaintiff Damaris Maldonado Viñas remained married to Carlos Iglesias-Alvarez

for twenty-two years until his death on November 2, 2011. Complaint, ¶ 6; Answer to

Complaint, Docket No. 26, ¶ 6; NW Docket No. 42-1, ¶2 and P's response at Docket No.

44-1; P's Statement of Fact, ¶1, Docket No. 44-1 and NW's response at Docket No. 52-1.

6. Plaintiffs Juan Carlos Iglesias Maldonado and José Carlos Iglesias Maldonado are the two sons of Damaris Maldonado Viñas and Carlos Iglesias-Alvarez.   Complaint, ¶7, Docket No. 1, and corresponding answer at Docket No. 26.

7. Carlos Iglesias-Alvarez died on November 2, 2011. Complaint, ¶ 15; Answer to Complaint, Docket No. 26, ¶ 15; NW Docket No. 42-1, ¶7 and P's response at Docket No. 44-1.

8. Plaintiffs Juan Carlos Iglesias Maldonado, José Carlos Iglesias Maldonado and Damaris Maldonado Viñas, as his widow, have been declared the legal heirs of Carlos Iglesias-Alvarez in Puerto Rico and are all residents of San Juan, Puerto Rico. Complaint, ¶3, Docket No. 1, and corresponding answer at Docket No. 26.

9. At the time of his death, Carlos Iglesias-Alvarez and his wife Damaris Maldonado Viñas had approximately $47,000.00 in Puerto Rican bank accounts.   Additionally, Carlos Iglesias-Alvarez and his wife Damaris Maldonado Viñas had real property valued at approximately $344,000.   NW's Additional Facts, ¶28, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

10. At the time of his death, Carlos Iglesias-Alvarez had approximately $5,900,000.00 in Spanish bank accounts.   NW's Additional Facts, ¶29, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.   The parties to an inheritance partition document executed in Spain (between Carlos Iglesias-Alvarez's mother, brother, widow and sons), which did not include National Western, acknowledged that the money in

those Spanish bank accounts belonged to the conjugal partnership constituted between Carlos Iglesias-Alvarez and Damaris Maldonado Viñas.

11. After Carlos Iglesias-Alvarez's death, National Western deposited the amount of $2,661,170.65 in an interpleader proceeding before the Commonwealth of Puerto Rico Court of First Instance, which corresponded to the insurance benefits of three additional annuities subscribed by the deceased, which are not at issue in this case.   One of the annuities named Damaris Maldonado Viñas as beneficiary, a second one named Joel de Jesús as the beneficiary, and the third did not identify a beneficiary but Joel de Jesús claimed he had been designated as its beneficiary.   Of the funds deposited in Court, Plaintiffs received $1,206,093.01 pursuant to Annuity no. 0101240500. Through settlement with Joel de Jesús, the other co-defendant and claimant against the funds of the other two Annuity policies, Plaintiffs received the amounts of $1,278,300 out of the $1,568,000 in benefits allocated to Annuity no. 0101279900 and $176,777.64 out of the $192,777.64 allocated to Annuity no. 0101282428. The balance of the insurance benefits of $305,700.00 was paid out to Mr. De Jesús. National Western was not a party to this settlement document.   NW's Additional Facts, ¶30, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

## II. National Western's Procedures
## Regarding the Same Annuity Policies

12. Defendant National Western is an insurance company chartered in the State of Colorado with principal offices in Austin, Texas and licensed in 49 states, the District of Columbia, and several U.S. territories, including Puerto Rico.   Complaint, ¶4, Docket No.

1, and corresponding answer at Docket No. 26; NW's Additional Facts, ¶1, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

13. National Western provides insurance products on a global basis to meet the life insurance needs of well-defined market segments, including Puerto Rico.   NW's Additional Facts, ¶2, at Docket No. 52-1 and P's response thereto at Docket No. 55-1

14. Section F-4 of National Western's Agent Procedure Manual says in part:

> Completion of the application and any additional required forms in full is an important step in avoiding processing delays. The application is part of a legal contract and approved by the various state insurance departments. Prior to submission, review the documents thoroughly for completeness and verify that no information has been omitted. Pay close attention to the following:…. The application has all necessary signatures… Signature of owner if other than insured.

Exhibit F to Docket No. 44 (Agent Procedure Manual, produced by National Western); P's Statement of Fact, ¶14, Docket No. 44-1 and NW's response at Docket No. 52-1.

15. The signatures of the Owner and the Annuitant are obtained on the day the annuity application is filled out; for the policy's efficacy the beneficiary's signature is not needed. The Owner of the policy is the equivalent of the buyer of the same, even if he did not pay for the policy. The Owner is the one to whom the insurer pays or returns the principal, plus interest or profits. The Beneficiary is the one who will receive the payments at the time of the Annuitant's death.   Here, the owner and beneficiary were the same person.   Exhibit I to Docket No. 44, p.8 (National Western Answer to Interrogatory No. 4 in Civil Case No. K AC2012-0300); P's Statement of Fact, ¶1, Docket No. 44-1 and NW's response at Docket No. 52-1.

16. Once the application form is completed by the authorized agent and received in National Western's offices in Austin, it is assigned a policy number, which is handwritten by National Western personnel on the pertinent application form.

17. Since at least December 2001, National Western has not kept the originals of any insurance or annuity contracts it issues, as most of its records are kept as electronic documents.   NW's Additional Facts, ¶3, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

18. Rather than having a full electronic copy of each contract issued, it is National Western's practice to recreate a contract by printing out the various forms that, as a whole, constitute an entire policy and attaching them to the application, which together form the particular contract needed.   NW's Additional Facts, ¶4, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

### III. The Annuities at Issue in This Case

19. On April 30, 2011, Carlos Iglesias signed a National Western Life Insurance Company application which would eventually entail the issuance of Annuity no. 0101270833 (Annuity no. 1). Exhibit A to Docket No. 44; Complaint ¶8, admitted in Answer to Complaint; P's Statement of Fact, ¶2, Docket No. 44-1 and NW's response at Docket No. 52-1.   Acknowledging that its legal implications are an issue in the case, it is stipulated that Damaris Maldonado Viñas did not provide written consent for this act.

20. On the application which was issued as Annuity no. 0101270833 (Annuity no. 1), Carlos Iglesias named his brother Francisco J. Iglesias-Alvarez as the annuity's

beneficiary.   Exhibit A to Docket No. 44; Complaint ¶ 9, admitted in Answer to Complaint; P's Statement of Fact, ¶3, Docket No. 44-1 and NW's response at Docket No. 52-1.

21. On May 2, 2011, Carlos Iglesias executed another application for another annuity with National Western Life Insurance Company (original Annuity no. 2). Complaint, ¶ 12; Answer to Complaint, Docket No. 26, ¶ 12; see, also, Docket No. 11-3, p. 1 and p. 35; NW Docket No. 42-1, ¶3 and P's response at Docket No. 44-1; P's Statement of Fact, ¶10, Docket No. 44-1 and NW's response at Docket No. 52-1.   Acknowledging that its legal implications are an issue in the case, it is stipulated that Damaris Maldonado Viñas did not provide written consent for this act.

22. The May 2, 2011 application identified "Francisco J. Iglesias Alvarez" (Carlos Iglesias-Alvarez's brother) as beneficiary of original Annuity no. 2, and Carlos J. Iglesias as the annuitant. Complaint, ¶ 13; Answer to Complaint, Docket No. 26, ¶ 13; Docket No. 11-3, p 35; NW Docket No. 42-1, ¶5 and P's response at Docket No. 44-1.

23. The May 2, 2011 application identified "Francisco J. Iglesias", with Social Security number 127 44 4919 and address at Ave. Magnolia P-9 Magnolia Gardens, Bayamón, P.R, as the "owner" of the annuity.   Exhibit E to Docket No. 44; P's response to NW's ¶5 at Docket No. 44-1; P's Statement of Fact, ¶11, Docket No. 44-1 and NW's response at Docket No. 52-1.

24. As a citizen and resident of Spain, Francisco J. Iglesias-Alvarez does not have a social security number and his Spanish N.I.D./N.I.F. number is 000 65 1420.   Docket No. 44-11, at p. 2.

25. The Ave. Magnolia P-9, Magnolia Gardens, Bayamón, P.R address at the time the annuity was issued was the location of Carlos Iglesias' business operation, where no one resided.

26. Both annuity applications were received at National Western on May 4, 2011. NW's Additional Facts, ¶¶5-6, at Docket No. 52-1 and P's response thereto at Docket No. 55-1

27. The application form dated April 30, 2011 was assigned Annuity no. 0101270833 (Annuity No. 1), and the application form dated May 2, 2011 was originally assigned Annuity policy number 0101270834 (original Annuity no. 2).   NW's Additional Facts, ¶6, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

28. Carlos Iglesias-Alvarez submitted $1,467,500 to National Western to pay for Annuity no. 0101270833 (Annuity no. 1) and $1,467,500 to pay for Annuity no. 0101270834 (original Annuity no. 2).   Complaint ¶¶ 8&12, admitted in Answer to Complaint; P's Statement of Fact, ¶17, Docket No. 44-1 and NW's response at Docket No. 52-1; NW's Additional Facts, ¶7, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

29. National Western received Cashier's Check number 1555 697 000 001982, dated April 26, 2011, drawn from Banco Santander's International Madrid, Spain office,

for the total amount of $2,935,000, with instructions from Carlos Iglesias to split the funds between the two annuities.   Exhibit G to Docket No. 44 (Document produced by National Western.); P's Statement of Fact, ¶¶18-19, Docket No. 44-1 and NW's response at Docket No. 52-1; NW's Additional Facts, ¶7, at Docket No. 52-1 and P's response thereto at Docket No. 55-1 .

30. The funds used for the issuance of Cashier's Check number 1555 697 000 001982, dated April 26, 2011, and the eventual payment of the two annuities at issue here, are presumed to belong to the conjugal partnership of Carlos Iglesias-Alvarez and Plaintiff Damaris Maldonado Viñas.   National Western has no evidence to rebut such legal presumption.

IV. The Insurance "Agent" for Annuity no. 1270833 (Annuity no. 1)

31. Regarding Annuity no. 0101270833, the person representing herself as National Western's agent was Marangelis Rivera.   Exhibit A to Docket No. 44; Complaint ¶ 10, admitted in Answer to Complaint; P's Statement of Fact, ¶4, Docket No. 44-1 and NW's response at Docket No. 52-1.

32. Marangelis Rivera did not have an agent's license from the Office of the Commissioner of Insurance of the Commonwealth of Puerto Rico.   She has never had a file at the Office of the Commissioner of Insurance.   Exhibit B to Docket No. 44 (Negative certification from Commissioner of Insurance); P's Statement of Fact, ¶5, Docket No. 44-1 and NW's response at Docket No. 52-1.

33. The insurance agent license provided by Marangelis Rivera to National Western, and kept in the Company's file, was falsified and lacked the Insurance Commissioner's signature. P's Statement of Fact, ¶¶7-8, Docket No. 44-1 and NW's response at Docket No. 52-1.

34. National Western had informed the Office of the Insurance Commissioner on two different dates (January 31, 2011 and December 31, 2011) of its appointment of Marangelis Rivera as an authorized agent.   Docket No. 52-2. Although pertinent personnel verifies if the listed individuals actually have an active agent license registered at their office at the time such notice is received in order to file a copy of the notice in their file, the Office of the Insurance Commissioner does not contact the insurance company that made the appointment if it identifies an individual that does not possess a valid license at the time of the appointment, as it is possible that such a license may be requested later.   Docket No. 44-13, Orozco Deposition, pp. 24-29.

35. For approximately eight years prior to January 23, 2012, when the Office of the Insurance Commissioner implemented a new licensing system known as SBS, the name of all licensed agents in Puerto Rico was listed in the office's website and available to the public, albeit in different locations of the website. Email supplementing deposition testimony of April 13, 2015 4:30:11 PM; Docket No. 44-13, Orozco Deposition, pp. 20.

36. The standard contract form executed by National Western and Marangelis Rivera as a National Western agent in Puerto Rico sets forth as follows:

3. **APPOINTMENT**. We [National Western] appoint you personally... to procure applications for annuity contracts as are issued by us subject to our Ratebook and our Rules and Regulations. You ... agree to abide by our Rules and Regulations now or hereinafter in force, which Rules and Regulations shall constitute a part of this contract.

....

6. **AUTHORITY**. Your [i.e. Ms. Rivera's] right, power, or authority on our behalf shall exist only as expressly stated in this contract. No right, power, or authority shall be implied either from the grant or denial of powers specifically mentioned herein or the failure to mention any right or power herein.

You agree that you... are without authority to do or perform and expressly agree not to do or perform the following acts on our behalf: (a) incur any indebtedness or liability; (b) make, alter, or discharge contracts: (c) waive forfeitures; (d) quote rates other than as quoted by us; (e) extend the time for payment of any premium; (f) waive payment in cash; (g) guarantee dividends; (h) deliver any policy more than thirty (30) days after issuance by us; or (i) deliver any policy unless the applicant is in the health described in the application and in good health.

Further, you agree that you... shall not: (j) violate the insurance laws of any state in which you may be soliciting applications for annuities; (k) withhold any of our, the policyholder's, prospective policyholder's, or applicant's monies or property; (l) rebate or offer to rebate all or any part of a premium on our annuities; (m) induce or attempt to induce any of our policyholders to discontinue payment of premiums or to relinquish any annuity; (n) induce or attempt to induce any of our agents or brokers to leave our service; (o) perpetrate any fraud against us, our policyholders, prospective policyholders, or applicants; or (p) violate our Rules and Regulations which are incorporated herein. ...

Exhibit A, ¶¶3 and 6.

### V. The Insurance Agent for Annuity no. 0101270834 (original Annuity no. 2) and its Replacement, Annuity no. 0101271540

37. The person that originally signed as agent in the application form dated May 2, 2011 which was assigned Annuity no. 0101270834 was Carlos A. García.   Exhibit E to Docket No. 44, p. 2; P's Statement of Fact, ¶15, Docket No. 44-1 and NW's response at Docket No. 52-1; NW's Additional Facts, ¶8, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

38. The Office of the Insurance Commissioner had suspended Carlos A. García's license on September 13, 2010, but that suspension was still the subject of a judicial appeal. (Judicial notice: <u>Comisionado de Seguros de Puerto Rico v. Carlos Alberto García and Joel de Jesús</u>, 2011 WL 5190937 (TCA)); P's Statement of Fact, ¶16, Docket No. 44-1 and NW's response at Docket No. 52-1.

39. Moreover, prior to May 4, 2011 (when the applications were received at National Western), National Western had terminated Carlos García's agency contract, as he was facing this disciplinary proceeding before the Puerto Rico Office of the Commissioner of Insurance that raised questions as to the continued validity of his license as an agent in that jurisdiction.   NW's Additional Facts, ¶8, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

40. Thus, by May 9, 2011, National Western had prepared a check to reimburse Carlos Iglesias the funds received for the issuance of Policy 0101270834.   This check would eventually be voided to complete the process of issuing Annuity no. 0101270834. NW's Additional Facts, ¶9, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

41. On May 9, 2011, National Western's personnel, Lilly Michel-Sudderth, wrote an e-mail to National Western's then Assistant Vice President in the Domestic Marketing Department, Lura Rogers, regarding Policy 0101270834, indicating that: "The 1.4 million dollar case we cancelled out is on Carlos Iglesias-Alvarez #0101270834. We have the refund check ready to be mailed out.   Please let me know if we will or will not be

reinstating the agent.   Mr. James Rankin called earlier today to tell us that the agent was going to be reinstated."   NW's Additional Facts, ¶10, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

42. On that same date, Ms. Rogers responded that "The agent will not be reinstated but Néstor Torres may rewrite the case."   NW's Additional Facts, ¶11, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

43. Néstor Torres was at the time, and continues to be, an independent contractor designated as National Western's general agent under the Moody Insurance Group. NW's Additional Facts, ¶13, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

44. The ASSOCIATE REGIONAL GENERAL AGENT agreement between Néstor Torres and National Western dated August 8, 2000 provides, among other things:

> 3. **APPOINTMENT**. We appoint you personally ... to procure applications for insurance and annuity contracts as are issued by us subject to our Rate Book and our Rules and Regulations. You ... agree to abide by our rules and regulations now or hereinafter in force, which rules and regulations shall constitute a part of this contract.
> . . . .
> 6. **AUTHORITY**. Your [Mr. Torres's] right, power or authority on our behalf shall exist only as expressly stated in this contract. No right, power or authority shall be implied either from the grant or denial of powers specifically mentioned herein or the failure to mention any right or power herein.
> You agree that you and your agents are without authority to do or perform and expressly agree not to do or perform the following acts on our behalf: (a) incur any indebtedness or liability; (b) make, alter or discharge contracts; (c) waive forfeitures; (d) quote rates other than as quoted by us; (e) extend the time for payment of any premium; (f) waive payment in cash; (g) guarantee dividends; (h) deliver any policy more than thirty (30) days after issuance by us; or (i) deliver any policy unless the applicant is in the health described in the application and in good health.
> Further, you agree that you and your agents shall not (j) violate the insurance laws of any state in which you may be soliciting applications for

insurance; (k) withhold any of our, the policyholder's, prospective policyholder's or applicant's monies or property; (l) rebate or offer to rebate all or any part of a premium on our insurance policies or annuities; (m) induce or attempt to induce any of our policyholders to discontinue payment of premiums or to relinquish any insurance policy or annuity; (n) induce or attempt to induce any of our agents or brokers to leave our service; (o) perpetrate any fraud against us, our policyholders, prospective policyholders or applicants, or (p) violate our Rules and Regulations which are incorporated herein.

Exhibit B, ¶¶3 and 6.

45. Similarly, the MANAGING GENERAL AGENT CONTRACT dated April 9, 2003 as between Néstor Torres and National Western provided, in part:

> 3. **APPOINTMENT**. We appoint you personally ... to procure applications for insurance and annuity contracts as are issued by us subject to our Rate Book and our Rules and Regulations. You ... agree to abide by our rules and regulations now or hereinafter In force, which rules and regulations shall constitute a part of this contract.
> . . . .
> 6. **AUTHORITY**. Your [Mr. Torres's] right, power or authority on our behalf shall exist only as expressly stated in this contract. No right, power or authority shall be implied either from the grant or denial of powers specifically mentioned herein or the failure to mention any right or power herein.
> You agree that you and your agents are without authority to do or perform and expressly agree not to do or perform the following acts on our behalf: (a) incur any indebtedness or liability; (b) make, alter or discharge contracts; (c) waive forfeitures; (d) quote rates other than as quoted by us; (e) extend the time for payment of any premium; (f) waive payment in cash; (g) guarantee dividends; (h) deliver any policy more than thirty (30) days after issuance by us; or (i) deliver any policy unless the applicant is in the health described in the application and in good health.
> Further, you agree that you and your agents shall not (j) violate the insurance laws of any state in which you may be soliciting applications for insurance; (k) withhold any of our, the policyholder's, prospective policyholder's or applicant's monies or property; (l) rebate or offer to rebate all or any part of a premium on our insurance policies or annuities; (m) induce or attempt to induce any of our policyholders to discontinue payment of premiums or to relinquish any insurance policy or annuity; (n) induce or attempt to induce any of our agents or brokers to leave our service; (o) perpetrate any fraud against us, our policyholders,

prospective policyholders or applicants, or (p) violate our Rules and Regulations which are incorporated herein.

Exhibit C, ¶¶3 and 6.

46. Néstor Torres, a fully licensed National Western agent, was contacted to ascertain whether he would be reissuing the policy application.   NW's Additional Facts, ¶12, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

47. By May 12, 2011, Ms. Rogers wrote an email to the Moody Insurance Group, a national marketing organization contracted with National Western, regarding "Iglesias-Alvarez #1270834."   NW's Additional Facts, ¶13, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

48. The May 12, 2011 email to the Moody Group reads: "Vicki, attached you will find the application and other required forms that will have to be written and signed by the applicant Iglesias-Alvarez and Néstor as the writing agent."   NW's Additional Facts, ¶14, at Docket No. 52-1 and P's response at Docket No. 55-1.

49. The pertinent paperwork evidencing the issuance of the application by Néstor Torres was received at National Western by May 12, 2011, and that application was the basis for the issuance of Annuity policy number 0101271540. Annuity number 0101271540 replaced Annuity no. 0101270834, and thus became Annuity no. 2.   NW's Additional Facts, ¶15, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

50. Nevertheless, the paperwork received from Néstor Torres was incomplete when it was originally received, as on May 16, 2011 National Western personnel noted in

the underwriting copy for Annuity policy number 0101271540, that National Western "need[ed] to know if Francisco is owner – if so... he needs to sign all ppk [paperwork]." NW's Additional Facts, ¶16, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

51. By May 27, 2011, however, National Western received the forms with a signature in the designated area for the signature of the owner, as noted again in the underwriting notes for Annuity Policy Number 0101271540 which indicate that "Owner's sig. rec'd".   NW's Additional Facts, ¶17, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

52. Néstor Torres was sent a blank application form for him to submit to National Western for the re-issuance of the annuity policy.   P's additional facts at Docket No. 63 and National Western's response at Docket No. 65.

53. Néstor Torres did not use the blank form.   Rather, he used a partially completed form which included the handwritten number "1270834" on it, and which already had the annuitant's (Mr. Iglesias') photocopied signature on it, in order to obtain the signature of the owner from someone who was introduced to him as Francisco J. Iglesias.   P's additional facts at Docket No. 63 and National Western's response at Docket No. 65.

54. Néstor Torres has no recollection of completing any other section of the application paperwork used for the issuance of Annuity Policy Number 0101271540 other than a short visit to annuitant Carlos Iglesias' office during which he collected the

signature from someone introduced to him as Francisco J. Iglesias (and from whom he did not request any identification), and his placing of his own signature in the front page.

55. Soon thereafter, on June 7, 2011, National Western's Judy Edgar wrote an email to Néstor Torres, a duly licensed agent then and now, to inform him that "Policy #1271540 for Carlos Iglesias-Alvarez has been reissued under [his] agent account #74813."   NW's Additional Facts, ¶18, at Docket No. 52-1 and P's response thereto at Docket No. 55-1; Declaration of Karen Johnston, Docket No. 52-3, ¶21 and Exhibit H thereto.

56. Pursuant to National Western's records, Policy Number 0101270834 was never issued as a policy since the "agent" that processed it was "un-appointed" at the time the application paperwork was prepared.   NW's Additional Facts, ¶19, at Docket No. 52-1 and P's response thereto at Docket No. 55-1.

57. In addition to having the signature of the licensed agent (Néstor Torres) in all pages except the Annuity Suitability Questionnaire (which does not require it), the complete set of the paperwork pertaining to the application used to issue Annuity policy number 0101271540 included "a signature" in the places where the owner identified as Francisco J. Iglesias was required to sign.   NW's Additional Facts, ¶¶20-21, at Docket No. 52-1 and P's response thereto at Docket No. 55-1. The Annuity Policy number "0101271540" was handwritten by National Western in the first page of the application form documents package, which was the Application Form page signed by Carlos García and which did not have a signature in the line designated for the owner named as Francisco J. Iglesias.   Docket No. 52-5.

58. The parties agree that the beneficiary of both policies, Francisco J. Iglesias-Alvarez, the Spanish national, did not sign as the owner in the application form for Annuity no. 2, 0101271540.   Complaint, ¶ 14; Answer to Complaint, Docket No. 26, ¶ 14; see, also, Docket No. 11-3, p. 35; NW Docket No. 42-1, ¶6 and P's response at Docket No. 44-1.

### VI. Francisco J. Iglesias-Alvarez's Receipt of the Insurance Benefits for Both Annuities and Related Issues.

59. After Carlos Iglesias-Alvarez's death, National Western received an Annuity Claim form and W-9 form, apparently printed from the internet, directly from Francisco J. Iglesias-Alvarez from his residence in Spain pertaining to Annuity no. 0101271540, Annuity no. 2.   Docket No. 11-1, ¶5.

60. National Western's Claims Department then responded to Mr. Francisco J. Iglesias-Alvarez, by letter dated January 7th, 2012 sent to his address in Spain, informing him he was also the primary beneficiary of Annuity no. 1.   In that same letter, National Western requested that Mr. Francisco J. Iglesias-Alvarez complete an additional claim form and a W8-Ben form because he was not a U.S. resident.   Docket No. 11-1, ¶¶6-7.

61. Mr. Francisco J. Iglesias-Alvarez submitted the additional documentation requested on February 9, 2012, again directly from his residence in Spain.   Docket No. 11-1, ¶8.

62. National Western's Claims Department paid Mr. Francisco J. Iglesias-Alvarez the claim benefits of $1,643,600 arising under Annuity no. 1 on February 23, 2012, and the benefits of $1,500,000 arising under Annuity no. 2 on March 13, 2012. The

corresponding checks were sent directly to his address in Spain.    Docket No. 11-1, ¶9 and Exhibit D thereto.

63. Acknowledging that its legal implications are an issue in the case, it is undisputed that on April 24, 2015, Francisco J. Iglesias-Alvarez, the Spanish national, claiming to be the Francisco J. Iglesias identified as owner in Annuity no. 2, executed a document entitled "Ratification of Annuity Policy Number 0101271540". Exhibit 2 to Docket No 41 ("Ratificación de Póliza de Anualidad o Contrato de Renta Anual Número 0101271540" and certified translation thereto), p. 1 ¶ 4; NW Docket No. 41-2, ¶8 and P's response at Docket No. 44-1.

## LEGAL ANALYSIS

### A. Annuity No. 2: Originally Ending in 0834, which Later Became the Annuity Ending in 1540.

The Court begins its analysis out of chronological order with Annuity no. 2, as a component of its analysis here is applicable to the issues presented for Annuity no. 1.

Annuity no. 2 had a rocky creation.    It is undisputed that the agent who issued the annuity initially, when it was originally assigned the number ending in 0834, was Carlos García ("Mr. García) and his license had been suspended by the Insurance Commissioner, and apparently also by NW itself.   The annuity was cancelled by NW and a check was issued to refund the premium to Mr. Iglesias, but before the check was mailed, the annuity was then reissued by NW.   This now became Annuity no. 2, and it was re-issued by a new agent, Néstor Torres ("Mr. Torres") and assigned a new number ending in 1540.

As stipulated by the parties, Mr. Torres was sent a blank form by NW to reissue the policy.  Mr. Torres decided instead to use a copy of the original form for the annuity ending in 0834 which was subsequently never issued, and which already contained Mr. Iglesias' signature on it.  This is contrary to NW's policies, which require that the signature of the policy be made in the agent's presence, and further, pursuant to federal anti-money laundering regulations, that there be an "in-person meeting with the customer" where a visible comparison is made to confirm, via an official photographic identification, that the person signing is, in fact, the correct party.  See Docket No. 55. Mr. Torres simply erased Mr. García's signature on the form and substituted it with his own.

NW has conceded that annuity ending in 0834 was invalid and was never issued, but argues that Mr. Iglesias' photocopied signature on its replacement, the annuity ending in 1540, should nevertheless be considered valid because the fact that Mr. Iglesias signed the original document proves he wished to establish the annuity and, thus, evidences consent.  While the Court is clear that Mr. Iglesias' wish was to establish an annuity in his brother's favor, the particular one he actually signed was, in fact, never issued, a fact expressly stipulated by the parties.

The Court is unconvinced that the re-issued annuity can be valid by simply using a photocopied signature on a paper.  What Mr. Iglesias signed was an annuity that was never issued and is, therefore, invalid.   While no caselaw has been cited by the parties for this issue, the Court finds that a photocopy cannot serve to establish consent for such an

important matter and where such a substantial amount of funds are at issue, much less when NW's regulations are clear on this matter and require an "in person" signature to be obtained and a valid photo identification be presented.

Yet, the re-issued annuity also had a second problem.   It lacked the signature of the owner/beneficiary, Francisco Iglesias, the Spanish national.   It is undisputed, and NW so admits, that the signature on the re-issued form was not that of the intended beneficiary or owner.   Although the signature reads "Fco. J Iglesias", it is uncontested that the person who signed that name was not the Spanish national who ultimately received the funds.   See Uncontested Fact no. 58.

As is well known, the requirements for a valid contract under Puerto Rico law are few and simple, to wit: (1) the consent of the contracting parties; (2) a definite object of the contract; and (3) the cause for the obligation. P.R. Laws Ann. tit. 31, § 3391.   Under Puerto Rico law, consent of a party is invalid only if "given by error, under violence, by intimidation, or deceit." P.R. Laws Ann. tit. 31, § 3404; Sánchez-Santiago v. Guess, Inc., 512 F.Supp.2d 75, 79 (D.P.R.2007); Soto v. State Chem. Sales Co. Int'l, 719 F. Supp. 2d 189, 191-92 (D.P.R. 2010) aff'd sub nom, Soto v. State Indus. Products, Inc., 642 F.3d 67 (1st Cir. 2011).

The "in person" signature by the owner/beneficiary was also a requirement by NW, insofar as the parties agree that "[n]evertheless, the paperwork received from Mr. Torres was incomplete when it was originally received, as on May 16, 2011 National Western personnel noted in the underwriting copy for Annuity Policy Number 0101271540, that

National Western "need[ed] to know if Francisco is owner – if so... he needs to sign all ppk [paperwork]." See Uncontested Fact no. 50.   Therefore, this was a requirement set forth by NW itself, which was also not met at the time the policy was created.   While the subsequent signature was, in fact done in person and before Mr. Torres, the photo identification was not performed as it is agreed upon that the owner/beneficiary, Mr. Francisco Iglesias, the Spanish national, did not sign it.   Therefore, he did not consent.

NW posits that "someone signed the application for Annuity Policy No. 2 on behalf of Francisco J. Iglesias, evidencing the owner's consent".   See Docket No, 73, p. 20.   The Court is flabbergasted as to how NW reached this conclusion, since NW has expressly admitted that the person who received the funds _was not_ the same person who signed the annuity and even worse, that it does not know who the person who signed the annuity even is.   Therefore, it is clear that Francisco Iglesias, the Spanish national, did not sign the document, and thus, could not and did not consent.   This automatically voids the annuity.

NW posits a second argument for this annuity's validity, and states it is valid because the person who ultimately received the funds, Francisco Iglesias, the Spanish national, later ratified it.   This argument is unavailing to NW for several reasons.

First, the person identified as owner of Annuity no. 2 is a "Francisco J. Iglesias" with social security number 127 44 4919, and an address at P-9 Magnolia Ave., Bayamón, Puerto Rico.   That is the business address of the decedent, Mr. Iglesias, and where no one resided.   It is also undisputed that Francisco Iglesias is a citizen and resident of

Spain, not Puerto Rico, and consequently has no Social Security number.  Therefore, there is an issue as to whether the person who received the funds in question is the same party referred to in the annuity.  Pursuant to the terms of the NW form filled out, the parties' own admissions, the identification data provided of the owner/beneficiary, and the later attempts at ratification, it would seem that they are not the same person, even though they have the same name.

NW wants the Court to hold that Mr. Iglesias' intentions to help his brother "were clear" with the issuance of the annuities and therefore, the person who ultimately received the funds and the person indicated in the annuity are one and the same due to "the totality of circumstances".  The Court cannot so conclude, precisely because the information provided either by Mr. Iglesias to NW, or which was entered by NW in the annuity form differs so greatly from reality.   In other words, the Court cannot hold that a person who is listed as living in Puerto Rico with a United States Social Security number is one and the same as a citizen of Spain with no Social Security number and who has instead a Spanish identification number, even if they share the same name.   Simply put, Defendant has not put the Court in a position to rule in its favor.

Second, as NW correctly points out, consent to contracts may be supplied by a third party who represents the contracting party upon its perfection.   It consequently argues that the "correct" Francisco Iglesias (Spanish national) gave the person who actually signed the application authorization to do so, and thus, that person signed "on his behalf".  See Docket No. 73, p. 17.

Article 1211 of the Puerto Rico Civil Code expressly provides that: "[n]o one can contract in the name of another without being authorized by him or without having his legal representation according to law.   A contract executed in the name of another by one who has neither his authorization nor legal representation shall be void, unless it should be ratified by the person in whose name it was executed before being revoked by the other contracting party."   P.R. Laws Ann. tit. 31, § 3376; see also Kogan v. Registrador, 125 D.P.R. 636, 672 (1990).   The validity of the representative's consent, however, depends on the existence of a mandate, and if there is no mandate, it depends upon the contracts' subsequent ratification.   Id. at 673.   If a third party contracts in the name of another without a mandate, the contract is not enforceable until it has been ratified – because the contract lacks the consent of the real contracting party.   Soto v. Rivera, 144 D.P.R. 500, 515 (1997).

Thus, what was needed in this case was a valid mandate, and its absence, a ratification.   There is no mandate in evidence.   On the contrary, NW wants the Court to make a leap and assume that there was a mandate, even when it admits that it was not the beneficiary who signed the application and further, that it does not know who, in fact, actually signed the document.   Thus, the alleged consent provided to whomever signed the application form cannot be valid, as Francisco Iglesias, the Spanish national, never evidenced his consent for another to sign the annuity.   Thus, Annuity no. 2, with the signature provided, is invalid.

Damaris Maldonado Viñas, et al., v. National Western Life Insurance Company
Civil No. 14-1192 (CVR)
Opinion and Order
Page 28
_____

While ratification can cure this situation, compounding the problem is that the attempt at ratification here, which came much later, also fails.    NW argues that Francisco Iglesias, the Spanish national, later ratified the consent and thus, the annuity is valid. Yet, the ratification here occurred on April 24, 2015, which was *years* after NW had already disbursed the funds in February and March, 2012.   Yet, under Puerto Rico law, the contract was not enforceable until it was ratified.    Thus, NW could not legally disburse the funds until after April 24, 2015, at which time Plaintiffs had already called for the annuity's invalidation.    The question then becomes whether Plaintiffs can invalidate the contract here.

NW argues that Plaintiffs were not parties to the contract and cannot revoke it. Under the explicit terms of the contract, however, the owner only had rights vis-a-vis the contract while Mr. Iglesias was alive.   Pursuant to Article II, section 2.1, of the annuity contract, the annuity owner may exercise his or her rights only "while the Annuitant is alive." (Docket No. 11-3 at p. 25).   Therefore, all of Francisco Iglesias' rights as the "owner" terminated upon Mr. Iglesias' death, as was found by Hon. Francisco A. Besosa, District Judge, at Docket No. 25.[1]

So what is left here as the contracting parties are NW and Mr. Iglesias, the deceased.   Since Mr. Iglesias has no rights as a deceased person, Plaintiffs herein thus

_____

[1]  This reasoning is also applicable to Defendant's argument that the case lacks an indispensable party in Francisco Iglesias, the Spanish national, because he received the funds at issue in this case.   Besides the fact that the Court has twice rejected this argument, a party cannot be indispensable if his rights under the contract were extinguished, which they were here pursuant to the clear terms of the contract the moment Mr. Iglesias died.   Besides, no facts have changed that would warrant the Court to examine this issue anew.

inherit his rights and are put in his shoes, as it were, because "a succession is the transmission of the rights and obligations of a deceased person to his heirs." P.R. Laws Ann. tit. 31, §2081; see also Feliciano Suárez, Ex parte, 117 D.P.R. 402 (1986) (A succession includes not only the rights and obligations of the deceased, in the condition in which they existed at the time of his death, but it also includes the property belonging to such succession after the same is opened, and the charges and obligations inherent therein."); Estate of Dávila v. Registrar, 15 P.R.R. 652 (1909) ("Heirs are the continuators of the person of their predecessor in interest, and for that reason it cannot be said that they are different persons").   Thus, Plaintiffs, as Mr. Iglesias' heirs, have the same legal right as Mr. Iglesias to revoke the annuity in question before it could be ratified, which they did.   Because of this, the ratification performed by Francisco Iglesias, the Spanish national, in 2015 was ineffectual.

Simply put, consent by Francisco Iglesias, the Spanish national, had to be given at the inception of the contract, not at the end, and it was not given at the inception.   The ratification performed was also invalid, for the reasons explained above.

In view of the above, Annuity no. 2 is null and void.

### B.  Annuity no. 1, ending in 0833.

Annuity no. 1 was issued by Marangelis Rivera ("Ms. Rivera"), who undisputedly was unlicensed at the time she issued the annuity.   Although she possessed a valid license from NW as their agent, the license that is issued to agents by the Puerto Rico Commissioner of Insurance, and by which authority NW presumably granted her

Damaris Maldonado Viñas, et al., v. National Western Life Insurance Company
Civil No. 14-1192 (CVR)
Opinion and Order
Page 30

authority to sell their insurance products in Puerto Rico, was falsified.   Thus, Ms. Rivera had no authority in Puerto Rico to issue the annuity in question.   The issue here is whether the annuity is nonetheless valid.   The Court finds it is not, and returns to facts pertaining to Annuity no. 2 for its analysis.

As previously discussed, it is undisputed that the agent who created Annuity no. 2 when it was assigned the number ending in 0834 was Mr. García, and his license had been suspended by the Insurance Commissioner, and apparently, by NW itself.   NW argues that courts have found that an otherwise valid insurance contract will not be voided merely because the agent lacked a license and "what is more important is whether the insurance company is authorized (licensed) by the respective authorities to issue the policy in question".   However, the fact that original Annuity no. 2 (ending in 0834) was cancelled by NW precisely because Mr. García lacked a license by both NW and the Commissioner is telling.   The Court finds that the uncontested facts show that the original Annuity no. 2 was cancelled not only because it lacked the signature of the owner, making it automatically invalid, but because of the fact that the agent who issued it had no license.

The stipulated facts state that the Office of the Insurance Commissioner had suspended Mr. García's license on September 13, 2010, and that prior to May 4, 2011 when NW received the applications, NW had also terminated Mr. García's agency contract because he was facing disciplinary proceedings before the Puerto Rico Office of the Commissioner of Insurance that raised questions as to the continued validity of his license

as an agent.   See Uncontested Fact nos. 38 and 39.   It is on the basis of this that by May 9, 2011, NW prepared a check to reimburse Mr. Iglesias the funds received for the issuance of the policy ending in 0834, and indicated in an email: "The 1.4 million dollar case we cancelled out is on Carlos Iglesias-Alvarez #0101270834. We have the refund check ready to be mailed out. Please let me know if we will or will not be reinstating the agent."   Thus, NW believed original Annuity no. 2 was invalid because it had been issued by an agent without a license,[2] and in fact, proceeded to issue a full refund check to Mr. Iglesias. This is sufficient to find that the annuity issued by Ms. Rivera was likewise also void, because if a lack of a license was applicable to the cancellation of original Annuity no. 2, this reasoning has to be equally applicable to Annuity no. 1.   NW clearly did not apply its argument, that the important thing is that it was "authorized (licensed) by the respective authorities to issue the policy in question", to Mr. García's policy, as NW cancelled it precisely because of his lack of licenses.   While it is true that Mr. García lacked both the Puerto Rico Commissioner and NW licenses and Ms. Rivera lacked only the Puerto Rico Commissioner's license, her lack of a local license is sufficient to find the annuity void, as will be explained in more detail below, because the Court finds that issues of public policy apply to the instant case.

NW argues it did not know that Ms. Rivera's license was a forgery and avers on this basis that Annuity no. 1 is valid.   It also posits that Ms. Rivera exceeded her mandate and

---

[2]   See also Uncontested Fact no. 56: "Pursuant to National Western's records, Policy Number 0101270834 was never issued as a policy since the 'agent' that processed it was 'un-appointed' at the time the application paperwork was prepared".

thus, NW should not be penalized.   Further, it claims that jurisdictions have held the policies sold by unlicensed agents are still valid.   Plaintiffs argue that local public policy considerations prevent enforcement of the document at issue.

Looking at Puerto Rico law on this matter, it is silent regarding whether a policy issued by an unlicensed agent can nevertheless be valid.   Instead, it simply states that "no insurer... shall accept insurance applications transacted through a person who does not hold a license issued according to th[e] Code for the kind of insurance transacted." P.R. Laws Ann. tit. 26, § 949j(1).   It further provides that "[n]o insurer [...] shall pay any commission or compensation whatsoever for transacting insurance unless by the date the same is due the person entitled to the same holds a license issued pursuant to this Code for the kind of insurance transacted." P.R. Laws Ann. tit. 26, § 949j(2).   Thus, it would seem that if the agent has no license, the company "should not accept" the policy and as for the available remedies, the agent will not be paid a commission.   A violation of this requirement is subject to sanctions and deemed a misdemeanor punishable with a fine. P.R. Laws Ann. tit. 26, § 949i.   It is silent on whether such a contract is void.

Plaintiffs argue that Courts that have found such contracts enforceable in jurisdictions have specifically provided for their validity via statute.   Citing to Florida law, they argue that it specifically states that policies sold by uninsured agents are enforceable.   Since there is no such legal statement in Puerto Rico law, Plaintiffs claim they are unenforceable, and urge the Court to declare the annuity null.   They further cite to case law that establishes that, in those jurisdictions where the license requirement is

predicated on public policy considerations of protecting the consumer, a policy issued by an unlicensed agent is void.

In turn, Defendant argues the opposite, to wit, that because there is no strict prohibition against invalidating a policy issued by unlicensed agents, it should be held valid.

Puerto Rico's Supreme Court has stated that the main objective of the license requirement here is to protect the public, and that the insurance business carries with it "substantial public interest". San Miguel Lorenzana v. ELA, 134 D.P.R. 405, 414-415 (1993), citing Maryland Cas'y Co. v. San Juan Rac'g Assoc., Inc., 83 D.P.R. 559, 563 (1961); Comisionado v. Anglo Porto Rican, 97 D.P.R. 637, 640 (1969); Comisionado de Seguros v. Tribunal Superior, 100 D.P.R. 546, 553 (1972). This was reaffirmed by the drafters' of the insurance code, which Plaintiffs persuasively cite. See Docket No. 74, p. 16. Also worthy of noting at this juncture is the long held principle under Puerto Rico law which permits the contracting parties to establish the agreements, clauses, and conditions convenient to them, provided they are not contrary to law, morals, or public order. P.R. Laws Ann. tit. 31, § 3372; Flores v. Municipio de Caguas, 14 P.R. Offic. Trans. 674, 684 (1983).

The Court finds persuasive Plaintiffs' argument that contracts are unenforceable when they are entered into by unlicensed agents in other jurisdictions where the license requirement is based on public policy considerations of consumer protection. Particularly insightful is the quote from the Western District of Arkansas, which held that

Damaris Maldonado Viñas, et al., v. National Western Life Insurance Company
Civil No. 14-1192 (CVR)
Opinion and Order
Page 34

"[a]ny contract entered into by an unlicensed agent is void and unenforceable even though the statute does not expressly declare such contracts to be void.   Such statutes are adopted as a matter of public policy to further the public interest and their benefits cannot be waived".   Dunn v. Phoenix Village, Inc., 213 F.Supp. 936, 947 (W.D. Ark. 1963).

Thus, to hold that the annuity here is enforceable would negate the intent of the government to regulate the insurance business and the considerable public policy concerns which are attached to that, and everyone would be at liberty to issue annuities and policies without a license.   The consumer cannot be said to be protected when an unlicensed layperson, who lacks the expertise of a license and the knowledge which accompanies it, sells such a highly regulated product.   Surely that was not the intent of the Legislature when it sought to regulate the insurance business.   See San Miguel Lorenzana v. ELA, 134 D.P.R at 413 ("The government has ample discretion in the establishment and implementation of norms and procedures regarding the admission to practice different professions"... "The main purpose of the license requirement is to protect the public...it guarantees the consumers that the people that possess a valid insurance agent license are adequately qualified for the job").   Therefore, the Court finds that Annuity no. 1 is null and void on public policy grounds.

Having found that both annuities are void under the aforementioned arguments, the Court does not reach Plaintiff's third argument, namely, that the annuities are void because they were purchased with conjugal partnership funds and Mrs. Maldonado did not consent in writing to their purchase.

Now that it has held that both annuities are void, the Court considers the available remedy.   It has been held that a null and void contract can never be ratified, because "it lacks one or more of its essential elements or because it contravenes a forbidden legal precept and therefore, lacks the capacity to generate the intended, new legal outcome desired by the parties".   José Ramón Vélez Torres, <u>Curso de Derecho Civil: Derecho de Contratos</u>, Tomo IV, Vol. II, 1st ed., San Juan, 1990, p. 123.   Regarding the effects of such a contract, the Puerto Rico Supreme Court has held that "every null contract is inexistent in law from the very moment in which it is issued or created, and therefore, never creates any legal consequences".   <u>Pérez Mercado v. Martínez Rondón</u>, 130 D.P.R. 134, 150 (1992) (*quoting* <u>Santiago Marrero v. Tribunal Superior</u>, 89 D.P.R. 835 (1964)).   Hence, it is as if the two annuities in the present case never existed.   They never created a legal, binding obligation.

Article 1255 of the Puerto Rico Civil Code, provides that "[w]hen the nullity of an obligation has been declared, the contracting parties shall restore to each other the things which have been the object of the contract with their fruits, and the value with its interest, without prejudice to the provisions contained in the following sections."   P.R. Laws Ann. tit. 31, §3514.   Here, that object is the moneys Mr. Iglesias paid for in order to set up the annuities.   The moneys must be restored to Plaintiffs.

NW counters with the argument that "the Estate of Carlos Iglesias-Alvarez is precluded from seeking repayment of the insurance premiums until such time as the monies National Western paid to the sole beneficiary of Annuities Nos. 1 and 2, Francisco

<u>Damaris Maldonado Viñas, et al., v. National Western Life Insurance Company</u>
Civil No. 14-1192 (CVR)
Opinion and Order
Page 36

J. Iglesias-Alvarez, are returned in full".   Docket No. 73, p. 25.   Citing to Louisiana Civil law commentators Planiol & Ripert, it correctly posits that "[t]he general effect of nullity is very simple: things should be put back into the same state as if the null contract had not been executed"[3], and thus, should the Court find in Plaintiff's favor, it cannot pay Plaintiffs until Plaintiffs are "in a position to refund" the amounts paid to Francisco Iglesias.

Yet, NW forgets that it was NW itself who gave the moneys to Francisco Iglesias, the Spanish national, not Plaintiffs.   Thus, it is NW who must recover the funds, because as Plaintiffs correctly point out Plaintiffs "cannot restore what has not been given to them".   Docket No. 78, p. 18.   NW must deal with its own claim for reimbursement against Francisco Iglesias, the Spanish national, separately.   NW's argument is thus inapposite.

## CONCLUSION

For the aforementioned reasons, the Court DENIES Defendant's Motion for Summary Judgment (Docket No. 73), and GRANTS Plaintiffs' Motion for Summary Judgment (Docket No. 74).   Payment shall be made by Defendant to Plaintiffs in accordance with this Opinion and Order.   Judgment will be entered accordingly.

On a final note, the Court must commend both parties for their clear and well-articulated arguments, the excellent quality of their work, and for diligently working on a joint set of facts that could be used for both motions.

---

[3] Planiol & Ripert, 2-1 TREATISE ON THE CIVIL LAW §1277.

IT IS SO ORDERED.

In San Juan, Puerto Rico, on this 31st day of March, 2016.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ RIVE
UNITED STATES MAGISTRATE JUDGE